IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                                      )
GEORGIA GLASSIE,                    )
              Plaintiff   `   )
                                                      )
     v.                          )   No. 1:20-cv-00493-MSM-PAS
                                                      )
PAUL DOUCETTE, JOHN TAFT  )
and THOMAS GLASSIE,          )
              Defendants   )
_____)

MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

      This case concerns a first marriage versus second marriage family dispute over a substantial estate that has played out its "long and tortured history" for more than ten years in state courts. *Marcia Glassie v. Doucette*, No. NP-2019-0213, 2020 WL 6736281, at *1 (R.I. Super. Nov. 6, 2020). The Rhode Island Supreme Court called it "a complicated, multistate continuing saga over the decedent's estate, arising in the context of a legacy of wealth," *Alison Glassie v. Doucette*, 157 A.3d 1092, 1094 (R.I. 2017). It has "interwoven the [superior c]ourt in a serpentine procedural morass between the Probate Court, the Superior Court, and the Supreme Court . . . ." *Marcia Glassie*, 2020 WL 6736281, at *1.

      The tentacles of that morass have reached out to this Court.

1

This Court, however, finds that the "probate exception" to federal jurisdiction applies and, as a result, it declines the invitation of the plaintiff to become yet another judicial participant in the disposition of the estate. The defendants' Motions to Dismiss (ECF Nos. 15, 18 and 19) are, for the reasons outlined below, GRANTED.

## I.   BACKGROUND

Donelson C. Glassie ("Donelson") died on February 3, 2011. Before his death, he had been married twice. He and his first wife, Phyllis Fragola, had two children: Elizabeth Doucette ("Elizabeth") and Thomas Glassie ("Thomas").[1] Donelson and his second wife, Marcia Glassie, had three additional daughters: Georgia Glassie ("Georgia"), the eldest, who is the plaintiff here, Alison, and Jacquelin ("Jacqi").[2] Both marriages ended in divorce. His son, Thomas, is one of the defendants here; the others are Paul Doucette ("Doucette"), who is married to Elizabeth, and John Taft ("Taft"), Donelson's former business partner. Doucette, the son-in-law, is the executor of the estate.

Georgia refers to herself, her mother, and her sisters Alison and Jacqi, as "the Jamestown clan" --a moniker she asserts was given to them derisively by Doucette. She refers to Elizabeth and her half-brother Thomas as "the favored beneficiaries," a description that reflects her own perception of Doucette's treatment of the estate

---

[1] As have the previous courts addressing this dispute, I refer to most of those involved by their first names to avoid confusion. No disrespect is intended.
[2] A fourth child, Christopher, was born after the marriage to Marcia and after the execution of the Will; he has apparently played no part in the relevant litigation. (ECF No. 1, ¶ 25).

beneficiaries generally.  The plaintiff included in the complaint a helpful family tree (ECF No. 1, ¶ 23):



The gravamen of Georgia's complaint is that Doucette has carried out his role as executor by systematically attempting to defraud her and her second-marriage siblings out of their full rightful shares in order to benefit the first marriage children.

Donelson was a wealthy hotelier in Newport and New York.  Several allegations in the complaint refer to business interests of Donelson's in hotels and other entities.[3]  While the estate has not yet been finally valued, it appears to have been considerable.

---

[3] The complaint sets forth a tangled web of intertwined business dealings between hotels that are part of the estate and other entities Donelson was involved in that are not.  A big part of Georgia's allegations of mismanagement of the estate to the extent of breach of fiduciary obligation involve one entity's loaning money to another entity, secured by assets of the estate.  There is a particular entity, called Historic Inns, whose membership includes all the parties here, but Georgia alleges that Doucette, her brother Thomas, and Taft, acted fraudulently in carrying out certain transactions in secrecy from her and without her authorization.

Georgia has brought a complaint under the Racketeer Influenced and Corrupt Organizations ("RICO") and Mail Fraud and Other Fraud Offenses Acts accusing the defendant of committing wire and bank fraud. 18 U.S.C. §§ 1961, 1962 (1970); 18 U.S.C. §§ 1343, 1344 (1952). She alleges a pattern of illegal activity conducted through a joint enterprise whose purpose was to defraud her out of her rightful inheritance. (ECF No. 1, Count 1). In addition, she claims liability under various state law torts for breach of fiduciary duty (count II and III), breach of contract (count IV), negligence and misrepresentation (count V), fraud (count VI), and civil conspiracy (count VII).

As early as 2012, soon after Donelson's death, Marcia began to litigate the disposition of the estate, suing in Rhode Island Superior Court to enforce a portion of her divorce agreement in which Donelson had allegedly promised to leave her $2,000,000 in his will. *Marcia Glassie v. Doucette*, 159 A.3d 88, 92 (R.I. 2017). Around that time, Alison also brought a superior court action for breach of contract concerning Donelson's agreement in the divorce to fund a trust for Jacqui equal to those previously established for Georgia and Alison.

Meanwhile, Donelson's will was presented for probate in the Newport Probate Court. It has not yet been closed, a fact at the heart of many of Georgia's complaints, as she accuses her brother-in-law, Doucette, of deliberately keeping the estate open to further his own interests by continuing to collect fees as executor. The superior

court consolidated its cases with the probate court's to bring some order and efficiency to the litigation.[4]

## II. STANDARD OF REVIEW

The defendants have brought Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) (1949) ("Rule 12(b)(1)"), claiming lack of subject-matter jurisdiction. To the extent that jurisdiction depends on facts whose accuracy is contested, "[a] plaintiff's jurisdictional averments are entitled to no presumptive weight; the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties." *Valentin v. Hospital Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001). In this dispute, it is the *sufficiency* of the plaintiff's averments that are at issue: has the plaintiff "propounded an adequate basis for subject-matter jurisdiction?" *Id.* In assessing the sufficiency of the claim to establish subject matter jurisdiction "the court must credit the plaintiff's well-pleaded factual allegations (usually taken from the complaint . . .), draw all reasonable inferences from them in her favor, and dispose of the challenge accordingly." *Id.* In line with that directive, all facts alleged are taken from the complaint and assumed to be true. (ECF No. 1).

---

[4] There have been at least four state court opinions to date: *Marcia Glassie v. Doucette*, No. NP-2019-0213, 2020 WL 6736281, at *1 (R.I. Super. Nov. 6, 2020); *Marcia Glassie v. Doucette,* No. NP-2019-02NP-2019-0213, 2020 WL 5406037, at *1 (R.I. Super. Sept 2, 2020); *Marcia Glassie v. Doucette*, 159 A3d 88 (R.I. 2017); *Alison Glassie v. Doucette*, 157 A.3d 1092 (R.I. 2017).

## III. JURISDICTION

Georgia claims both sources of this Court's jurisdiction: a federal question[5] because of the RICO allegation and diversity jurisdiction[6] based on her California residency, the Florida residency of Thomas Glassie, and the Rhode Island residency of Paul Doucette and John Taft. (ECF No. 1, ¶¶ 12-15).

The defendants, moving to dismiss pursuant to Rule 12(b)(1), contend that subject-matter jurisdiction is lacking because of the applicability to each of these jurisdictional prongs of the "probate exception," a doctrine applied by the United States Supreme Court to divest the federal courts of what would otherwise be their authority to hear "all civil cases" under 28 U.S.C. §§ 1331 and 1332. Generally, the plaintiff has the burden of establishing subject-matter jurisdiction. *Cristobal-Torres v. Cristobal-Torres*, 401 F. Supp. 3d 216, 218 (D.P.R. 2019). But once a plaintiff establishes diversity, as Georgia has, the burden shifts to the defendant to establish that the case falls within an exception to diversity jurisdiction. *Tartak v. Del Palacio*, No. 09-1730 (DRD), 2010 WL 3960572, at *9 (D.P.R. Sept. 30, 2010). There is no logical reason that the same burden-shifting paradigm would not apply to federal question jurisdiction. *Cf. Jones v. Brennan*, 465 F.3d 304, 306 (7th Cir. 2006).

The probate exception, like its close kin the "domestic relations exception," has its roots in common law.

> Among longstanding limitations on federal jurisdiction otherwise properly exercised are the so-called "domestic relations" and "probate" exceptions. Neither is compelled by the text of the Constitution or

---

[5] 28 U.S.C. § 1331 (1980).
[6] 28 U.S.C. § 1332 (2011).

> federal statute. Both are judicially created doctrines stemming in large measure from misty understandings of English legal history.

*Marshall v. Marshall*, 547 U.S. 293, 298 (2006). The two are exceptions to the general rule that a federal court "will not take jurisdiction if it should not; but it is equally true, that it must take jurisdiction if it should." *Cohens v. Virginia*, 19 U.S. 264, 291 (1821), quoted in *Marshall* at 298.

Until *Marshall*, the probate exception had been applied broadly, whenever federal jurisdiction would "interfere with the probate proceedings" of a state court. *Markham v. Allen*, 326 U.S. 490, 494 (1946). Thus, a federal court could "entertain suits 'in favor of creditors, legatees, and heirs' and other claimants against a decedent's estate 'to establish their claims,'" but could not "exercise its jurisdiction to disturb or affect the possession of property in the custody of a state court." *Id.*

In *Marshall*, however, the Court clarified what it meant to interfere with the probate proceedings explaining that the "probate exception" is a limited one.[7] 547 U.S. at 298. The "probate exception," the *Marshall* Court declared, is "essentially a reiteration of the general principle that, when one court is exercising *in rem* jurisdiction over a *res,* a second court will not assume *in rem* jurisdiction over the same *res.*" *Marshall*, 547 U.S. at 311. In practical terms, *Marshall* prohibits a federal court only from doing three things: (a) probating or annulling a will, (b) administering an estate, and (c) "dispos[ing] of property that is in the custody of a state probate

---

[7] *See Ankenbrandt v. Richards*, 504 U.S. 689, 701 (1992), (characterizing the "domestic relations" exception as similarly limited covering "only a narrow range of domestic relations issues").

court. But it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction." *Id.* at 311-12. This "distinctly limited" exception does not preclude federal jurisdiction simply when the federal action is "intertwined with [or] binding on those state proceedings." *Jimenez v. Rodriguez-Pagan*, 597 F.3d 18, 24 (1st Cir. 2010).

The task for a court confronted with a claim of a probate exception is to press past the labels and determine whether the asserted federal action is merely intertwined with state probate proceedings or, in practical respect, would entail either administration of the estate or distribution of the *res* in the custody of the probate court. *See Mulet v. De la Fuente,* 228 F. Supp. 2d 12, 15-16 (D.P.R. 2002) (court must look behind the labels to the effect of an action). *Accord Turton v. Turton*, 644 F.2d 344, 348 (5th Cir. 1981) (court must go beyond the labels to assess the impact on the jurisdiction of the probate court). Simply invoking *in personam* jurisdiction over the executor and not *in rem* jurisdiction over the estate does not shield the action from scrutiny over whether it impermissibly intrudes into the administration of assets or affects the *res* of the estate.

Thus, for example, the *Marshall* court itself found the exception inapplicable to an *in personam* claim for tortious interference which alleged that one of the beneficiaries had prevented the testator's gift to another by effectively imprisoning him and making misrepresentations to him. 547 U.S. at 301-02. The Bankruptcy

Court had awarded $449 million in compensatory damages.[8] *Id.* at 301. Reversing what had been the Ninth Circuit's broad application of the probate exception, the Supreme Court declared that adjudication of the "widely recognized tort," did not probate the will or declare it a nullity, did not administer the state, and did not direct disposition of an estate asset. *Id.* at 312.[9] Instead, the compensatory damages were awarded against the tortfeasor personally, a remedy outside distribution of the estate assets. *Id.*

---

[8] The judgment was reduced by the amount the plaintiff was awarded in probate court, but the Supreme Court ultimately reversed that reduction.

[9] The Court takes this opportunity to correct a blatant misstatement in one of the defendants' filings. In his Memorandum in Support of his Motion to Dismiss, Doucette manipulates a putative quotation from *Marshall* in a way so misleading that it should not go without comment. The Memorandum contains the following passage:

> Second, state courts are better equipped to resolve probate disputes. The Supreme Court recognized that state courts have developed specialized expertise and procedures for handling cases involving the administration of estates. *See Marshall v. Marshall*, 547 U.S. 293, 312 (2006) **(citing state probate courts' "special proficiency" in handling probate matters as a "sound policy consideration[]" supporting the probate exception)."**

(ECF No. 16, p. 4) (bold face supplied). In fact, the Opinion said precisely the opposite:

> Furthermore, **no "sound policy considerations" militate in favor of extending the probate exception to cover the case at hand**. Cf. *Ankenbrandt [v. Richards]*, 504 U.S. [689, at] 703, 112 S. Ct. 2206 [(1992)]. Trial courts, both federal and state, often address conduct of the kind Vickie alleges. **State probate courts possess no "special proficiency in handling [such] issues**." Cf. *id.,* at 704, 112 S. Ct. 2206.

*Marshall*, 547 U.S. at 312 (ellipse and brackets original) (bold face supplied).

Similarly, in the leading case in this Circuit, *Jimenez v. Rodriguez-Pagan*, 597 F.3d 18, 23 (1st Cir. 2010), the court held the exception not applicable to prevent an action by a widow to exercise an option on real estate and to recover a share of proceeds from the sale of stocks. Neither property, nor the real estate nor the stocks, were part of the estate and thus none was "in the custody of a state probate court." *Id.* at 24. That the widow sought to bring them *into* the estate did not constitute distribution of estate assets: "While divvying up an estate falls squarely within the probate exception, merely increasing it does not." *Id.* In *Sinclair v. Sampson*, No. CV 16-127S, 2017 WL 758486, at *2 (D.R.I. Jan. 26, 2017), *adopted* 2017 WL 750479 (D.R.I. Feb. 27, 2017), the action was to recover assets allegedly misappropriated by the plaintiff from her mother's estate. The plaintiff was not seeking to "adjudicate the rights to specific assets presently within the custody or control of the probate court." *Id.* Instead, "[i]f they are successful on their Counterclaims, Defendants may recover additional assets to be included in the estate." *Id; see also Henry v. Sheffield*, 856 F. Supp. 2d 345, 351-52 (D.R.I. 2012) (probate exception not applicable to *in personam* actions to recover property allegedly wrongfully distributed).

On the other hand, actions that require the federal court to "make factual findings and conclusions of law regarding, the Executor's identification, administration and handling of assets of the Estate," thus forcing a court "to prematurely enter into an accounting and assessment before the local probate court has had an opportunity to rule on these very matters," are barred. *Mulet*, 228 F. Supp. 2d at 16. Although an action is brought *in personam,* as this one is, it will "still

fall[] within the probate exception to diversity jurisdiction [if] the relief sought would interfere with the administration of an ongoing probate and partition proceeding." *Id.* at 17.

Two related factors are particularly deserving of scrutiny to determine whether the probate exception precludes jurisdiction. The first is whether the probate proceedings are ongoing. *See Lebron-Yero v. Lebron-Rodriguez*, No. 18-1665 (RAM), 2020 WL 1493897, at *3 (D.P.R. Mar. 24, 2020) (where there were no ongoing probate proceedings, there was "no risk of disposing of property in the custody of a commonwealth probate court"). There is more potential for impermissible interference if probate proceedings have not been completed. The assets are still within the custody of the probate court. *In re Garcia*, 507 B.R. 32, 43 (1st Cir. 2014).

Second, when the relief requires an accounting of the estate, and there has not yet been a final accounting in probate court, the exception is likely to apply. *Lebron-Yero*, 2020 WL 1493897, at *3 (plaintiff's claim for return of property required a premature accounting that only a probate court can do); *see also*, *Mulet*, 228 F. Supp. 2d at 16 (remedy would force court to "prematurely enter into an accounting and assessment before the local probate court has had an opportunity to rule on these very matters"). *See Henry*, 856 F. Supp. 2d at 351-52 (federal claim brought after final administration of estate).

The claims Georgia makes here are much like those in *Stuart v. Hatcher*, 757 F. App'x 807, 808 (11th Cir. 2018) (per curiam).[10] There, a federal court action claiming breach of fiduciary duty was brought before probate proceedings had been completed. Id. The essence of the claim, as here, was alleged mismanagement of the administration of the estate, a failure to collect on amounts owed to the estate, the incurring of unnecessary expenses, the paying of unnecessary professional fees, and the executor's resistance to plaintiff's attempts to obtain an accounting. *Id.* at 809. Like Georgia, the plaintiff claimed the estate had been diminished as a result. *Id.* The Eleventh Circuit recognized that resolution of that claim would require valuing the estate which in turn would require a premature accounting. *Id.* at 810. Focusing on the *effect* of the claim, the court noted that the labeling of the action as an *in personam* one against the executor rather than an *in rem* one against the estate was not dispositive. *Id.*

When one goes behind Georgia's labels, the vulnerability of this case to the probate exception becomes clear. Each of the roads her complaint maps lead to the probate court.[11] The factual allegations in Georgia's complaint fall into several categories: 1) that Doucette's mismanagement of the estate, abetted by defendants Taft and Thomas, has caused its value to diminish, thus depriving her of the full

---

[10] Georgia's complaint that this opinion is unpublished is correct, but unpublished decisions still may be given persuasive value if issued after January 1, 2007. Fed. R. App. P. 32(1)(a) (2006).

[11] As noted above, the Rhode Island Superior Court has consolidated its proceedings with probate proceedings. The reference to "probate court" in this Opinion may therefore implicate the superior court, but the point is the same.

worth of the 10% share she was left,[12] 2) that Doucette has breached his fiduciary duty and committed other wrongs borne of a conflict of interest created by his marriage to Elizabeth, one of the first-marriage beneficiaries, 3) that Doucette has taken a number of actions either not authorized by the probate court or authorized only because of false or misleading statements by Doucette, 4) that Doucette has profited personally and unjustifiably by keeping the estate open and taking excessive fees, and 5) that Doucette has hidden information from her.[13]  The gist of the allegations are (paragraph numbers refer to the complaint, ECF No. 1):

A. Mismanagement

- That he rendered the estate vulnerable to several liabilities because he used the estate as collateral for loans that benefited non-estate businesses and other beneficiaries (¶ 52).  One of these loans favored a non-estate-owned business that is allegedly in danger of defaulting (¶¶ 75, 76)
- That he created large debts of the estate (¶ 7(ii))
- That he arranged a loan to the estate at a too-high interest rate, and put up an unnecessary amount of the estate to guarantee the loan (¶¶ 58, 60)
- That he lied to banks, creating effective liability (¶ 7(ix))

B. Conflict

- That Doucette took action that benefited the first marriage "favored beneficiaries" over the second marriage "Jamestown clan" (¶¶ 31-32)

---

[12] Georgia alleged she was left "a limited percentage interest in certain of Mr. Glassie's companies, and in addition a 10% share of the entire remainder of the Estate." (ECF No. 1, ¶ 27.)

[13] The defendants maintain that the inclusion of a RICO count in the Complaint is a transparent attempt to remove the case from the probate exception.  The RICO count, which alleges wire and bank fraud, relies on different factual assertions.  But to the extent that Georgia seeks compensation for an allegedly adverse impact on her share of the estate, the analysis that renders the probate exception applicable is the same for the RICO count.

- That he threatened beneficiaries from the second marriage by invoking the *in terrorem* clause[14] inappropriately (¶¶ 34-36)
- That his preference for favored beneficiaries is "a matter of record," (¶ 40)
- That he used his ability as executor to control 61% of a non-estate-owned business to benefit the favored beneficiaries who own a greater percentage of it than Georgia does (¶¶ 69, 72, 74)

C. Unauthorized Actions

- That, lacking authority, Doucette unilaterally guaranteed business debts with estate assets (¶ 53)
- That his encumbering of the estate as security for loans exceeded the authorization of the probate court and was on unauthorized terms. (¶¶ 62, 63)

D. Personal (Unjust) Enrichment

- That Doucette "parlay[ed]" a part-time limited position of executor into a decades-long position paying him $650,000 so far against a "reserved" fund of $2.3M (¶ 38)
- That he receives a salary for managing the estate-owned businesses as well as a fee as executor. (¶ 38)

E. Concealment of Information

- That Doucette failed to turn over discovery material in prior litigation (¶¶ 42, 43)
- That he "thwarted" Georgia's efforts to obtain meaningful information (¶ 46)
- That he refused to provide a sufficient accounting (¶ 47)
- That he "put her off" by pretending to prepare responses to her inquiries (¶ 48)
- That he threatened to disinherit her for requesting information (¶ 50)
- That he pressured her to release claims in order to avoid giving her information (¶ 50)

---

[14] An "*in terrorem*" clause is a provision threatening forfeiture if a beneficiary challenges the validity of the will. *What is IN TERROREM? The Law Dictionary* https://thelawdictionary.org/in-terrorem/#:~: text=In%20terror%20or%20warning% 3B%20by,regarded%20as%20a%20mere% threat (last visited Sept. 8, 2021).

Georgia seeks compensatory damages for these wrongs.[15] An inescapable fact, however, is that any calculation of damages requires precisely the kind of valuation and accounting that is within the exclusive province of the probate court, especially as probate remains open and there has been no final accounting. It is impossible to determine whether and to what extent Georgia's ten percent share of the residual estate has been diminished without determining the present value of the estate and what the monetary impact has been of the various transactions Doucette, with the alleged participation of the other defendants, has carried out. In addition, many allegations involve speculation about what *may* happen to the value of the estate as guarantor of loans to other entities that may end up in default.

Indeed, Georgia acknowledges that she cannot determine the damages she feels entitled to without full financial disclosure of the estate's finances. (ECF No. 1, ¶ 106). She complains that Doucette's withholding of information – which he presumably would have to disgorge in an accounting – renders her incapable of determining the value of her ten percent interest. *Id.* If Georgia cannot, for purposes of pressing this lawsuit, attach a value to her loss without a complete accounting of

---

[15] Many of the allegations concern Doucette's alleged conflict of interest, presumably as explanation for what Georgia terms his mismanagement. She does not seek a remedy from this Court, but the only remedy would be replacement of Doucette as executor which is within the exclusive province of the probate court. In addition, a number of the allegations involve Doucette purportedly exceeding the authority the probate court has given him to enter into certain transactions. A determination of the scope of the authority given him, the conditions of any approvals the probate court placed on transactions, and whether the authority has been exceeded or the conditions gone unmet are issues peculiarly within the purview of the probate court.

the estate, this Court cannot either, for the same reason. An accounting runs squarely into the probate exception and is beyond the power of this Court to order.

For these reasons, the Court concludes that the probate exception applies, and that subject-matter jurisdiction is lacking. The defendants' Motions to Dismiss (ECF Nos. 15, 18, 19) are GRANTED.

IT IS SO ORDERED:

_____
Mary S. McElroy,
United States District Judge

September 14, 2021