UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| GEORGIA GLASSIE,<br>　　　Plaintiff,<br><br>　　　v.<br><br>PAUL DOUCETTE, JOHN TAFT, and<br>THOMAS GLASSIE,<br>　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 1:20-cv-00493-MSM-PAS |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

This case is but a chapter in the "long and tortured history" of an estate dispute that has spanned nearly fifteen years. *Marcia Glassie v. Doucette*, No. NP-2019-0213, 2020 WL 6736281, at *1 (R.I. Super. Nov. 6, 2020). It involves "a complicated, multistate continuing saga over the decedent's estate, arising in the context of a legacy of wealth," *Alison Glassie v. Doucette*, 157 A.3d 1092, 1094 (R.I. 2017), that has "interwoven the [superior c]ourt in a serpentine procedural morass between the Probate Court, the Superior Court, and the Supreme Court . . . ." *Marcia Glassie*, 2020 WL 6736281, at *1. At its heart is a battle between two sides of the late Donelson Glassie's family: one from his first marriage, and the other from his second.

Before the Court are Motions for Summary Judgment by the defendants, Paul Doucette, John Taft, and Thomas Glassie (collectively, "Defendants"). (ECF Nos. 168; 172; 176.) The plaintiff, Georgia Glassie, asserts claims against Defendants based on their alleged mismanagement of the Glassie estate and its businesses. (ECF No. 1.)

Defendants argue that her claims all fail as a matter of law.  Georgia[1] opposes summary judgment and moves that the Court take judicial notice of a favorable decision in a parallel case in Rhode Island Superior Court, Newport County ("Newport Superior Court").  (ECF No. 198.)  For the following reasons, the Court GRANTS John Taft's Motion for Summary Judgment (ECF No. 168) and Thomas Glassie's Motion for Summary Judgment (ECF No. 172).  Paul Doucette's Motion for Summary Judgment (ECF No. 176) is GRANTED with respect to Counts I, II, IV, V, VI, and VII of the Complaint but DEFERRED with respect to Count III.  Georgia's Request for Judicial Notice and Supplemental Briefing (ECF No. 198) is GRANTED.

## I.    BACKGROUND

While the full tale of the Glassie family's ongoing estate dispute could likely fill volumes, the Court summarizes the facts most relevant to Georgia's present claims as follows.  Donelson Glassie was a successful businessman who amassed a substantial fortune before his death.  Donelson's estate (the "Estate") included interests in hotels and other business entities.  One of those businesses is most at issue here: Historic Inns of New York City, LLC ("HINYC"), which runs the Park South Hotel in New York City.

Donelson married twice during his life.  With his first wife, Phyllis Fragola, Donelson had two children: Elizabeth Doucette and Thomas Glassie.  With his second wife, Marcia Glassie, Donelson had three daughters: Georgia Glassie, the eldest, who

---

[1] As it and other courts have done so previously, and intending no disrespect, the Court refers to most of the Glassie family by their first names so as to avoid confusion.

is the plaintiff here, Alison, and Jacquelin.  Both marriages ended in divorce.  The defendants here are Thomas, Elizabeth's husband Paul Doucette ("Doucette"), and Donelson's former business partner John Taft ("Taft").  Doucette, Donelson's son-in-law, was the executor of the estate during the relevant time.[2]

Donelson's will divided the Estate unevenly among his beneficiaries.  Those from his first marriage—the so-called "favored beneficiaries"—received a greater share of the Estate.  Those from his second marriage—purportedly derisively referred to as the "Jamestown clan"—received less.  Georgia's primary interest in the Estate, as conveyed by Donelson's will, was a 2% interest in HINYC and a 10% interest in the Estate's residuary, i.e., the portion of the Estate left over after all the Estate's obligations are satisfied.[3]  Litigation over the Estate ensued shortly after Donelson's death on February 3, 2011, and the Estate has not yet been closed (and, as such, the residuary has not yet been distributed).

Georgia's Complaint claims that Defendants have engaged in a broad, ongoing conspiracy to defraud her out of her rightful inheritance.  (ECF No. 1.)  Apart from more general allegations regarding Doucette's stewardship of the Estate, Georgia's claims largely center around Defendants' management of HINYC.  *See id.*  Prior to Donelson's death, he was the sole managing member of HINYC.  After his death, in

---

[2] As explained below, on December 2, 2025, the Newport Superior Court issued a decision removing Doucette from his position as the Estate's executor.  *See Glassie v. Doucette*, NP-2022-0037.

[3] Due to a preexisting 3% interest in HINYC, Georgia will hold a 5% stake in the business when the Estate is ultimately distributed.

March 2011, all of HINYC's members, including Georgia, agreed to amend HINYC's Operating Agreement to appoint Taft, Doucette, and Thomas as managing members. This amendment provided that HINYC's managing members would manage the business by a majority vote among themselves, and that they would have "authority to do all acts necessary or convenient to or for the furtherance of the purpose described" in the Operating Agreement. (ECF No. 171-4 at 2.)

Two of the HINYC Operating Agreement's provisions are most implicated here. First, Section 4.8(a) provides in pertinent part:

> Except as provided in this Section 4.8, no non-managing Member, in his status as such, shall have the right to take part in the management or control of the business of the Company or to act for or bind the Company or otherwise transact business on behalf of the Company. Before the Managing Member may cause or permit the Company to take action with any of the events or actions listed below, the Managing Member shall obtain the written consent or affirmative vote of holders of a majority of the Percentage Interests in favor of such event or matter in accordance with the provision of this Section 4.8: . . . (ii) a sale, exchange, lease, mortgage, pledge or transfer of all or substantially all of the assets of the Company . . . ."

(ECF No. 172-1 at 14.) Under Section 4.8(a), non-managing members of HINYC do not have the right to take part in management of HINYC's business, and managing members are permitted to engage in a "sale, exchange, lease, mortgage, or transfer" of the business's assets if they obtain the consent of "holders of a majority of Percentage Interests." *Id.* The Estate holds a 61% interest in HINYC, which was controlled by Doucette as executor at all relevant times, thus effectively granting Doucette a majority percentage interest in HINYC.

4

Relatedly, Section 4.8(b) provides that "[w]henever Members are required or permitted to take any action by vote at a meeting, the Managing Member shall provide them written notice." *Id.* Section 4.8(c) similarly provides that, "[w]henever under this Section 4.8, Members are required or permitted to take any action by vote, such action may be undertaken without prior notice and without a vote" if, *inter alia*, the managing members "give prompt notice of the taking of the action . . . to those Members who have not consented in writing but who would have been entitled to vote thereon had such action been taken at a meeting." *Id.* at 14–15.

The other section at issue is Section 9.10, which provides the following requirements for amending the Operating Agreement:

> This Agreement may be amended in any manner by action of the Managing Member without the consent of all Members; provided, however, that no amendment of this Agreement shall (a) without the consent of all Members amend this Section 9.3 in a manner adverse to the Members; or (b) without the express written consent of such Member, (i) increase the liability of a Member beyond the liability of such Member expressly set forth in this Agreement, (ii) decrease the interest in the Net Profits and Net Losses of any Member, except as provided in Section 2.2, or (iii) decrease the Capital Account of any Member, except as provided in this Agreement.

*Id.* at 19. In other words, managing members may amend the Operating Agreement without non-managing members' consent so long as an amendment does not implicate one of the four things outlined in Section 9.10.[4]

---

[4] As will be discussed later, Georgia suggests that Section 9.10's reference to "this Section 9.3" contains a typographical error, and that Section 9.10 should properly be read as forbidding amendment to itself.

In 2019, HINYC began refinancing a number of consolidated loans, most of which were incurred and authorized by HINYC during Donelson's lifetime.  At issue here is the refinancing of a loan from OceanFirst Bank N.A. ("OceanFirst").  This was accomplished through a mortgage secured by the Estate's assets.  Defendants arranged this mortgage, which Georgia argues inherently damages her interest in the Estate in favor of the favored beneficiaries' greater interests in HINYC, without notifying Georgia and without meeting with non-managing members to vote on the transaction.  Defendants have amended HINYC's Operating Agreement to require that any further amendment of the Operating Agreement requires OceanFirst's written consent while the loan remains outstanding.  (ECF No. 171-5 at 6.)[5]

Beyond Defendants' management of HINYC, Georgia alleges that Doucette, in his capacity as the Estate's executor, engaged in a pattern of fiduciary misconduct involving self-dealing and actions taken to benefit the "favored beneficiaries" at the expense of the Jamestown beneficiaries.  The parties dispute many facts underpinning Georgia's allegations, parallel litigation over which has proceeded in Rhode Island state courts.  *See Glassie v. Doucette*, NP-2022-0037.

## II.    STANDARD OF REVIEW

Summary judgment's role in civil litigation is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Garside v. Osco Drug Inc.,* 895 F.2d 46, 50 (1st Cir. 1990) (quoting Adv. Comm. Notes to

---

[5] Georgia contests the characterization of this as an amendment because, as discussed below, she argues it was not made in accordance with Section 9.10's requirements.

Fed.R.Civ.P. 56). Summary judgment can be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir. 2000) (quoting *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir. 1996)).

In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Feliciano de la Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 5 (1st Cir. 2000) (citing *Mulero–Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 672 (1st Cir. 1996)). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I,* 53 F.3d 454, 460 (1st Cir. 1995). Furthermore, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial. . . . If the evidence presented 'is subject to conflicting interpretations, or reasonable [people] might differ as to its significance, summary judgment is improper.'" *Gannon v. Narragansett Elec. Co.,* 777 F. Supp.

167, 169 (D.R.I. 1991 (citing and partially quoting 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure,* § 2725, at 104 (1983)).

The moving party bears the initial burden of showing that summary judgment is proper. Fed. R. Civ. P. 56(a). However, "[w]hen the party who bears the burden of proof at trial is faced with a properly constituted summary judgment motion, defeating the motion depends on her ability to show that [a] dispute exists." *Geshke v. Crocs, Inc.*, 740 F.3d 74, 77 (1st Cir. 2014). The burden thus shifts to the non-moving party to "point to 'competent evidence' and 'specific facts' to stave off summary judgment." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *McCarthy v. N.W. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)). A non-moving party's failure to respond in more than a cursory way to a dispositive issue raised by a moving party at summary judgment results in waiver of the non-moving party's argument as to that issue. *See Montany v. U. New Eng.*, 858 F.3d 34, 41 (1st Cir. 2017); *Velez-Velez v. Puerto Rico Hwy. and Transp. Auth.*, 795 F.3d 230, 238 (1st Cir. 2015).

## III.   DISCUSSION

Georgia's Complaint asserts seven causes of action. (ECF No. 1 ¶¶ 107–49.) Count I is a claim under the Racketeer Influenced and Corrupt Organizations ("RICO") and Mail Fraud and Other Fraud Offenses Acts, 18 U.S.C. §§ 1961, 1962 (1970); 18 U.S.C. §§ 1343, 1344 (1952), accusing Defendants of committing wire and bank fraud by engaging in a joint enterprise of illegal activity to defraud Georgia out of her rightful inheritance. *Id.* ¶¶ 107–15 (citing 18 U.S.C. §1962(c)). Georgia's other

claims involve state law causes of action for breach of fiduciary duty (Counts II and III), breach of contract (Count IV), negligent omission or misrepresentation (Count V), fraud by omission (Count VI), and civil conspiracy (Count VII).  *Id.* ¶¶ 116–49.

Defendants' Motions for Summary Judgment collectively challenge all Counts, contending that all of Georgia's claims fail as a matter of law.  (ECF Nos. 168; 172; 176.)  The Court begins by addressing those claims that pertain to all Defendants and leaves for last Count III, which pertains only to Doucette in his capacity as the Estate's executor.

## A.    Count I: RICO

The RICO Act was designed by Congress to "supplement old remedies and develop new methods for fighting crime."  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 498 (1985).  The statute also, however, provides civil remedies for persons who are injured by a prohibited act.  *George Lussier Enterprises, Inc. v. Subaru of New Eng., Inc.*, 393 F.3d 36, 50 (1st Cir. 2004).  To succeed on a civil RICO claim under 18 U.S.C. §1962(c), an injured plaintiff must prove four elements: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity.  *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 14–15 (1st Cir. 2000).

Whether a plaintiff has been injured in a way that gives standing to assert a civil RICO claim is a threshold inquiry.  *Holmes v. Sec. Inv'r Protec. Corp.*, 503 U.S. 258, 268 (1992).  A RICO plaintiff's injury must have not only been factually caused by the defendant's actions, but also proximately caused as well.  *Id.*  This means that the defendant's alleged violation must have "led *directly* to the plaintiff's injuries."

9

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (emphasis added).  This direct-relationship requirement is not satisfied whenever the plaintiff's theory of causation requires moving "well beyond the first step." *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 612 (2025) (quoting *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 10 (2010)).  That a defendant's conduct may have foreseeably resulted in a plaintiff's injury is not enough.  *Id.*

Georgia contends two injuries give rise to her RICO claim: (1) attorneys' fees she has incurred in probate court as a result of Defendants' alleged unlawful scheming; and (2) damages to her vested interest in the Estate's residuary.  (ECF No. 195 at 61–64.)  Georgia presents no defense, however, to Defendants' argument that the second injury is clearly a derivative injury because she is one step removed from an injury to the Estate's residuary—in other words, it is the *Estate* which has been allegedly directly injured, not Georgia.  *See* ECF Nos. 177 at 20; 195 at 64.[6]  While the First Circuit does not appear to have ruled on this issue, the Court agrees with other courts that have found injuries to expectancy interests in estates to be too indirect to support RICO claims in similar circumstances.  *See, e.g.*, *Sheshtawy v. Gray*, 697 F. App'x 380, 382 (5th Cir. 2017); *Schrager v. Aldana*, 542 F. App'x 101, 104 (3d Cir. 2013); *Firestone v. Galbreath*, 976 F.2d 279, 285 (6th Cir. 1992).

Thus, to have standing for her RICO claim, the attorneys' fees incurred by Georgia in collateral litigation must be a sufficiently direct injury.  Courts are split

---

[6] Where Defendants raise essentially the same arguments, the Court cites to Doucette's briefing as generally comprehensive.

10

on whether attorneys' fees may give rise to civil RICO standing. *See Lemelson v. Wang Laboratories, Inc.*, 874 F. Supp. 430, 433 n.7 (D. Mass. 1994) (collecting cases). Georgia asks the Court to follow the Second Circuit and two First Circuit district courts in finding that legal expenses incurred in collateral litigation my give rise to civil RICO standing if they are proximately caused by racketeering activity. (ECF No. 195 at 62–63) (citing *D'Addario v. D'Addario*, 901 F.3d 80 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 1331 (2019); *Lawson v. FMR LLC*, 554 F. Supp. 3d 186, 197 (D. Mass. 2021); *Miller Hydro Grp. v. Popovitch*, 851 F. Supp. 7, 14 n.6 (D. Me. 1994)). Defendants, conversely, contend that doing so would conflict with the Supreme Court's admonition in *Horn*, 604 U.S. at 612, that a RICO plaintiff's theory of proximate causation must not go beyond the "first step" of the injuries from the alleged RICO scheme. (ECF No. 177 at 23.) Defendants also argue that, even should the Court consider legal fees as possible RICO injuries, the Court should only consider as direct injuries fees that were incurred as an "intended consequence" of a defendant's alleged illegal activities—such as where a defendant pursued vexatious litigation against a RICO plaintiff. *Id.* at 23–24.

While the First Circuit does not appear to have definitively ruled on this issue either, it seems likely that, if a defendant engages in an illegal enterprise whose aim is to force a plaintiff to expend legal fees through vexatious litigation—i.e., where the litigation itself is an instrument of illegal racketeering—those fees will constitute a direct injury that could give rise to civil RICO standing. *See Lemelson*, 874 F. Supp. at 433; *accord Eagle Inv. Sys. Corp. v. Tamm*, 146 F. Supp. 2d 105, 110 (D. Mass.

2001) ("Litigation costs alone, therefore, can constitute RICO injury, but only when they are the intended consequence of the defendant's racketeering activities"). But here, the collateral litigation was initiated by Georgia, not Defendants. Georgia does not appear to argue that Defendants directly *intended*, as an aim of their alleged illegal racketeering, to force her to incur legal fees, nor does she point to any specific facts that could give rise to a reasonable jury's inference of such an intent. *See* ECF No. 195 at 61–64.

Georgia's collateral legal fees are thus, like the alleged harm to her interest in the Estate's residuary, indirect injuries that are insufficient to support her standing to bring a civil RICO claim. Count I must therefore be dismissed.

### B.    Count II: Breach of Fiduciary Duty (HINYC)

Count II alleges that Defendants breached the fiduciary duties they owed as managers of HINYC. (ECF No. 1 ¶¶ 116–19.) The parties agree that New York law applies to this claim. *See* ECF Nos. 177 at 43–44; 195 at 66 n.9. Under New York law, the elements for a breach of fiduciary duty claim are: "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Johnson v. Nextel Commun., Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (citing *Barrett v. Freifeld*, 883 N.Y.S.2d 305, 308 (N.Y. App. Div. 2d Dept. 2009).

Defendants invoke several defenses to Georgia's claim that they breached their fiduciary duties with respect to their management of HINYC. One carries particular weight here: the business judgment rule. *See* ECF No. 177 at 46–49. "New York's business judgment rule creates a presumption that a corporation's directors act in

good faith and in the best interests of the corporation." *Patrick v. Allen*, 355 F. Supp. 2d 704, 710 (S.D.N.Y. 2005) (citing *Auerbach v. Bennett,* 47 N.Y.2d 619, 629, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979). Although the business judgment rule "originated in suits against corporate directors, it also protects the managers of LLCs." *Wen v. New York City Regl. Ctr., LLC*, 695 F. Supp. 3d 517, 546 (S.D.N.Y. 2023), *aff'd*, No. 23-7506, 2024 WL 4180521 (2d Cir. Sept. 13, 2024). The rule protects managers from judicial scrutiny of their good faith decisions. *Id.*

To invoke the business judgment rule, a manager must show: "(1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *In re Sci., Lang., and Arts Intl. Sch.*, 660 B.R. 21, 50 (Bankr. E.D.N.Y. 2024). Here, Defendants advance specific facts supporting each element of the rule: the OceanFirst loan was a business decision, they purportedly acted in the interests of HINYC, they undertook at least some amount of due diligence in securing the refinancing, and they claim to have acted in good faith in doing so. (ECF No. 177 at 47–48.)As a result, the burden shifts to Georgia to present sufficient, specific evidence to demonstrate that an issue of material fact precludes application of the business judgment rule to her claims under Count II.

Georgia makes no argument to Defendants' invocation of the business judgment rule, instead focusing her entire defense of her claims under Count II to an unrelated argument. (ECF No. 195 at 65–68.) She has therefore failed to point to "competent evidence" and "specific facts" to stave off summary judgment on Count II,

13

and dismissal of those claims is appropriate.[7]  *See Tropigas de Puerto Rico, Inc.*, 637 F.3d at 56.

### C.    Count IV: Breach of Contract

Count IV of Georgia's Complaint alleges that Defendants breached HINYC's Operating agreement by violating two of its provisions.[8]  (ECF No. 1 ¶¶ 126–32.) According to Georgia, Defendants violated the procedural requirements of Section 4.3 because they mortgaged HINYC's assets without providing adequate notice or allowing her to vote on the decision.  *Id.* ¶ 128.  She also alleges that Defendants violated Section 9.10 by amending the Operating Agreement in a way that (1) increases her liability; (2) decreases her interest in net profits and net losses; and (3) changes Section 9.10 in a manner adverse to her without her express written consent. *Id.* ¶ 129–30.  Defendants argue that they did not violate either of these provisions because they were not required to provide any notice and because they did not amend the Operating Agreement in a way that would require members' written consent. (ECF No. 177 at 37–41.)  Defendants also contend that Georgia has failed to show

---

[7] Georgia also makes no argument to Defendants' contention that her fiduciary breach claims under Count II are duplicative of her breach of contract claims under Count IV and are thus precluded by New York law.  *See Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 193 (S.D.N.Y. 2011) ("Under New York law, 'a cause of action for breach of fiduciary duty that is merely duplicative of a breach of contract claim cannot stand.'") (quoting *Grund v. Delaware Charter Guarantee & Tr. Co.*, 788 F. Supp. 2d 226, 249–250 (S.D.N.Y.2011)).

[8] New York law governs Georgia's breach of contract claims because Section 9.12 of the Operating Agreement provides that the contract "shall be governed by and construed in accordance with the laws of the State of New York without reference to the principles thereof respecting conflicts of laws."  (ECF No. 171-2 at 22.)

any damages resulting from their alleged breaches of the Operating Agreement. *Id.* at 41–42.

Regarding her first allegation, Georgia acknowledges that "Defendants' voting interests far outweigh Georgia's and they could have overruled her 'no' vote had they held a meeting." (ECF No. 195 at 87.) But she argues that, because Section 4.8(a) provides that managing members must obtain "the written consent or affirmative vote of holders of a majority of the Percentage Interests" before mortgaging HINYC's assets, that provision *permits* a vote by all the members even when the majority interest-holders are authorized to take the action without such a vote. *Id.* According to Georgia, that triggers Section 4.8(b) and Section 4.8(c), which contain procedural requirements anytime members "are required *or permitted* to take any action by vote at a meeting." (ECF No. 172-2 at 14–15) (emphasis added). In other words, Georgia argues that even though Defendants were authorized to arrange the OceanFirst loan without any other member's approval, because they *could* have sought that approval, they were required to satisfy Section 4.8's procedural notice requirements. (ECF No. 195 at 88.)

Georgia's reading of Section 4.8 is facially plausible. However, even if she is correct that Defendants were required to provide her with notice of their decision to arrange the OceanFirst loan, she identifies no specific facts suggesting that any lack of notice resulted in damages that could support a breach of contract claim, instead only claiming that, had she received notice, "she would have taken actions to stop or change their intended plans or otherwise protected her interests." (ECF No. 195 at

87.) This speculation is unsupported by any factual evidence and is undermined by her own admission that she had no power under the Operating Agreement to stop the OceanFirst loan.  Georgia's other suggested damages under Count IV all pertain to Defendants' alleged breach of Section 9.10.  *Id.* at 90–91.  Her breach of contract claims regarding Defendants' purported failure to comply with Section 4.8's notice requirements must therefore necessarily fail.

As for Georgia's second breach of contract allegation, her sole contention in response to Defendants' Motions for Summary Judgment is that Defendants violated Section 9.10 of the Operating Agreement by amending Section 9.10 to require OceanFirst's approval for future amendments.  *Id.* at 89.  According to Georgia, this constituted an amendment "in a manner adverse to the Members" that required consent "of all members."  *Id.*  But Georgia's argument relies on the Court reading Section 9.10's restriction on amendments to "this Section 9.3" as a typographical error, and that Section 9.10 should be properly read as prohibiting amendment to itself—i.e., it should prohibit amendment to "*this* section" or "this Section 9.10."  *Id.* at 89 n.12.

The Court agrees that, as written, Section 9.10's prohibition on amendment to Section 9.3 rather than Section 9.10 itself is peculiar, albeit not wholly unreasonable.[9] It would have made more business sense for Section 9.10 to limit amendment to itself. But the Court cannot disregard Section 9.10's plain text based on what it or the parties believe may have been intended.  *See W.W.W. Assoc., Inc. v. Giancontieri*, 566

---

[9] Section 9.3 concerns the right of members to seek dissolution of HINYC.

N.E.2d 639, 642 (N.Y. 1990). As it stands, either the word "this" or the reference to "9.3" could be typographical errors, and as Georgia supplies no other evidence in support of her preferred reading, the Court is bound to read Section 9.10 as restricting amendment to Section 9.3, not Section 9.10.

Therefore, under Section 9.10, Defendants were not required to obtain written consent of all members before amending the Operating Agreement to require OceanFirst's approval for future amendments. Georgia's breach of contract claims under Count IV must therefore necessarily fail.

### D.   Count V: Negligent Omission or Misrepresentation

Count V of Georgia's Complaint alleges that Defendants negligently failed to disclose the OceanFirst loan to her. (ECF No. 1 ¶¶ 133–40.) Under Rhode Island law, "[n]egligent misrepresentation is a tort of deceit not of mere negligence." *Ryder v. Pearson Educ., Inc.*, 486 F. Supp. 3d 489, 506 (D.R.I. 2020) (citation omitted).[10] To prevail on a negligent misrepresentation claim, a plaintiff must prove the following:

> (1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he or she ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation.

---

[10] The parties appear to agree that Rhode Island law applies to Georgia's negligent omission, fraud by omission, and civil conspiracy claims under Counts V, VI, and VII, presumably because these are tort claims not governed by the Operating Agreement's choice of law provision. *See, e.g.*, ECF Nos. 177 at 58–62; 195 at 92–96. The Court concurs that, under Rhode Island's choice of law rules, Rhode Island law governs these claims. *See Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 12 (1st Cir. 1994) (reviewing factors considered by Rhode Island courts when determining choice of law in tort cases).

*Williams v. Johnson & Johnson*, 581 F. Supp. 3d 363, 373 (D.R.I. 2022) (*quoting Cruz v. DaimlerChrysler Motors Corp.*, 66 A.3d 446, 453 (R.I. 2013)). "Damages for a claim of negligent misrepresentation are limited to pecuniary losses suffered." *Lifespan/Physicians Prof'l Svcs. Org., Inc. v. Combined Ins. Co. Am.*, 345 F. Supp. 2d 214, 226 (D.R.I. 2004).

Defendants cite specific facts suggesting that they "routinely provided information to Georgia" and argue that she has failed to show justifiable reliance upon any misrepresentations. (ECF No. 177 at 59–60.) Defendants also contend that, because Georgia has disclosed no expert opinion quantifying any damages regarding her misrepresentation claims, those claims must necessarily fail. *Id.* at 60–61. The burden thus shifts to Georgia to counter Defendants' arguments by pointing to specific evidence that would raise an issue of material fact to preclude summary judgment.

In her response to Defendants' Motions, Georgia focuses almost entirely on establishing that Defendants owed her a duty to disclose the OceanFirst loan and the amendment to the HINYC Operating Agreement, but she does not argue that she justifiably relied on any misrepresentation or omission by Defendants. *See* ECF No. 195 at 92–94. And while Georgia claims that she suffered an effective $310,000 pecuniary loss as a result of the Estate's assets being obligated to fund HINYC, this appears to be unsupported by any expert testimony or other evidence that would withstand summary judgment. *See id.* As such, summary judgment for Georgia's claims under Count V is warranted.

### E.    Count VI: Fraud by Omission

Count VI of Georgia's Complaint is largely analogous to Count V, in that Georgia alleges that Defendants' conduct with respect to the OceanFirst loan amounted to fraud by omission. (ECF No. 1 ¶¶ 141–46.) Claims for intentional and negligent misrepresentation "bear a strong family resemblance to each other." *Bisbano v. Strine Printing Co.*, 737 F.3d 104, 111 (1st Cir. 2013). "To recover for intentional misrepresentation—also known in Rhode Island as the tort of deceit— plaintiff must prove that the defendant knowingly made a false statement, intending to deceive, and induced the plaintiff to rely on it to his detriment." *Id.* at 112.

Defendants argue that Georgia's fraud by omission claims must necessarily fail for the same reasons as her negligent misrepresentation claims under Count V. (ECF No. 177 at 61–62.) Georgia offers no substantive argument beyond what she put forward in defense of her claims under Count V, and she cites no additional evidence suggesting that Defendants knowingly withheld information from her in a way that amounts to intentional misrepresentation. Given that Georgia's claims under Count VI bear a higher standard than those under Count V, and as the Court has determined that he claims under Count V must fail, her claims under Count VI must likewise fail.

### F.    Count VII: Civil Conspiracy

Count VII of Georgia's Complaint alleges that Defendants conspired to benefit themselves at the expense of the Jamestown beneficiaries. (ECF No. 1 ¶¶ 147–49.) Under Rhode Island law, to prove a civil conspiracy a plaintiff must show evidence of

19

"an unlawful enterprise." *Read & Lundy, Inc. v. Washington Tr. Co. of Westerly*, 840 A.2d 1099, 1102 (R.I. 2004). However, "civil conspiracy is not an independent basis of liability." *Id.* Instead, "[i]t is a means for establishing joint liability for other tortious conduct; therefore, it 'requires a valid underlying intentional tort theory.'" *Id.* (quoting *Guilbeault v. R.J. Reynolds Tobacco Co.*, 84 F. Supp. 2d 263, 268 (D.R.I. 2000)); *see also Bogosian v. Woloohojian*, 167 F. Supp. 2d 491, 503 (D.R.I. 2001) (finding a civil conspiracy claim to fail where the underlying fiduciary duty claim was found deficient).

To prevail on her civil conspiracy claim, one of the intentional torts alleged by Georgia to have been committed by Defendants collectively—i.e., her claims under Counts II, V, or VI—must also survive summary judgment. As the Court has determined that summary judgment for Counts II, V, and VI is warranted, her civil conspiracy claim must necessarily fail as well.[11]

### G.    Count III: Breach of Fiduciary Duty (the Estate)

Count III of Georgia's Complaint is asserted against Doucette alone, and alleges that he, as the Estate's executor, breached the fiduciary duty he owed to Georgia as a beneficiary. (ECF No. 1 ¶¶ 120–25.) Doucette argues that Count III

---

[11] Georgia also attempts to support her claims under Count VII by suggesting that Thomas and Taft additionally conspired to breach their fiduciary duties and commit fraud by omission as managing members of another business, Synergetic Real Estate Group, LLC, of which Georgia is a minority member. (ECF No. 195 at 96–102.) But her Complaint expressly provides that her breach of fiduciary duty and fraud by omission claims are made against Defendants with respect to their management of HINYC. (ECF No. 1 ¶¶ 116–119.) She cannot use her opposition to Defendants' Motions for Summary Judgment to bootstrap an underlying predicate tort not elsewhere pled or argued.

must fail because he acted in the best interests of the beneficiaries as a whole, did not treat Georgia disparately from other beneficiaries, timely gave her information upon her request, and acted at all times within his discretion as executor. (ECF No. 177 at 50–58.) Doucette also contends that Georgia has produced no evidence of actual damages and is indeed unable to do so because the Estate has not yet been distributed, rendering any calculated potential reduction to her interest in the Estate's residuary inherently speculative. *Id.* at 57–58.

In opposition to Doucette's Motion, Georgia identifies ten purported fiduciary breaches committed by Doucette during his role as executor: (1) giving false interrogatory answers during collateral litigation involving the Estate; (2) using Estate funds to pay legal fees in litigation not directly involving the Estate as a party; (3) disregarding legal advice to seek judicial approval of the OceanFirst loan; (4) transferring funds from the Estate's residuary to the Park South Hotel despite knowing that the Hotel would be unable to repay that money to the Estate; (5) failing to collect a $620,000 loan owed to the Estate by a business owned by Doucette, Elizabeth, and Thomas; (6) refusing to disclose Estate information to Georgia upon request; (7) attempting to coerce Georgia into signing a settlement agreement as part of litigation to which she was not a party; (8) asserting disinheritance claims against her and other Jamestown Beneficiaries; (9) making selective distributions of Estate assets to the advantage of the Favored Beneficiaries; and (10) financing Estate taxes through a loan in a way that effectively advantaged certain beneficiaries at the

expense of Georgia. (ECF No. 195 at 72–85.)[12] Georgia alleges that each of these acts caused her damages, either by forcing her to incur legal costs or by diminishing the overall value of her interest in the Estate. *Id.*

To buttress her claims under Count III, Georgia moves for the Court to take judicial notice of the Newport Superior Court's December 2, 2025, decision in *Glassie v. Doucette*, NP-2022-0037, as contained within a 232-page bench ruling transcript. (ECF No. 198.) That decision, *inter alia*, determined that Doucette, in his capacity as the Estate's executor, breached his fiduciary duties with respect to Georgia. *See* ECF No. 198-1. The decision ordered Doucette removed as Executor "effective now." *Id.* at 234. Georgia requests that the Court order supplemental briefing as to the "preclusive effect" of the decision. (ECF No. 198 at 9.) Defendants oppose Georgia's Motion, arguing that the Court cannot take notice of any of the decision's factual findings, which remain contested, and that, with respect to Taft and Thomas, the decision is irrelevant because they were not parties to that case. (ECF Nos. 204; 205; 206.)

Defendants do not, however, dispute that the Court may take judicial notice of the decision itself. Indeed, "[a] decision of a sister court is a proper matter of judicial

---

[12] Georgia also identifies several other purported fiduciary breaches committed by Doucette. *See* ECF No. 195 at 70–85. But these allegations are found nowhere in Georgia's Complaint; instead, years after this litigation commenced, she attempted to add them to a First Amended Complaint. (ECF No. 89.) By an order on December 16, 2024, The Court rejected Georgia's request for leave to file the First Amended Complaint, finding that she knew the facts and claims she sought to add well before the deadline to amend her Complaint expired. Once again, Georgia cannot now bootstrap those allegations into her opposition to Doucette's Motion for Summary Judgment.

notice," *Berrios-Romero v. Estado Libre Asociado de Puerto Rico*, 641 F.3d 24, 27 (1st Cir. 2011); *see also Lamar v. Micou,* 114 U.S. 218, 223 (1885) ("The law of any state of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof."). While Defendants are correct that the Court may not take judicial notice of the Newport Superior Court's factual findings, *see Berrios-Romero*, 641 F.3d at 27, what this means is that the Court cannot accept those factual findings for their truth. *See Lopes v. Riendeau*, 177 F. Supp. 3d 634, 666–67 (D. Mass. 2016). The Court *may*, however, take judicial notice of the fact that the Superior Court decided that Doucette had breached his fiduciary duties and ordered him removed as executor. Given the First Circuit's admonition that this Court "consider the potentially preclusive effect of any decisions of the probate court on the federal lawsuit," that it "coordinate with state courts to administer closely related cases so as to minimize duplicative discovery or proceedings," and that it "pay close attention to the state court's construction of state law," *Glassie v. Doucette*, 55 F.4th 58, 70 (1st Cir. 2022), the Court finds judicial notice of the Superior Court's decision proper.

Taking into account the Superior Court's decision (without accepting as true its factual findings), and having found that dismissal of all Georgia's other claims to be warranted, the Court is faced with a situation that, under normal circumstances, could implicate the doctrine established in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), which provides that a federal court may abstain in exceptional circumstances involving parallel state-court litigation.

23

*See Jimenez v. Rodriguez-Pagan*, 597 F.3d 18, 27–28 (1st Cir. 2010). The First Circuit previously found *Colorado River* abstention inapplicable here because this case failed to meet the threshold requirement that resolution of the state court case would mean "that the federal court will have nothing further to do in resolving any substantive part of the case." *Glassie*, 55 F.4th at 64 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 28 (1983)). But the First Circuit based that decision on its determination that there was "substantial doubt" that the state court case would resolve Georgia's federal claims, most notably her RICO claim. *See id.*

Now, however, Georgia's only remaining claim appears to be precisely the one that the Newport Superior Court decided: her breach of fiduciary duty claim against Doucette in his capacity as executor. As final judgment on that claim would resolve Georgia's only remaining claim here, the *Colorado River* doctrine's threshold requirement is satisfied. And at least one of the factors supporting *Colorado River* abstention—"the desirability of avoiding piecemeal litigation," *Jimenez*, 597 F.3d at 28—is implicated here, where a decision in Georgia's state court case was issued but final judgment may not yet have entered.

As such, given the First Circuit's prior admonitions to the Court, and in the interests of judicial comity with respect to the Newport Superior Court, the Court will defer ruling on Doucette's Motion for Summary Judgment with respect to Count III. Instead, the Court will order the remaining parties—Doucette and Georgia—to provide supplemental briefing on Count III, including on (1) whether the Court

24

should dismiss Count III under the *Colorado River* doctrine; (2) the preclusive effect, if any, of the Newport Superior Court's decision; and (3) whether summary judgment is otherwise appropriate with respect to Count III.

## IV.    CONCLUSION

In summary, for these reasons, the Court GRANTS the Motions for Summary Judgment of Defendants John Taft (ECF No. 168) and Thomas Glassie (ECF No. 172). Defendant Paul Doucette's Motion for Summary Judgment (ECF No. 176) is GRANTED with respect to Counts I, II, IV, V, VI, and VII of the Complaint but DEFERRED with respect to Count III. Georgia's Request for Judicial Notice and Supplemental Briefing (ECF No. 198) is GRANTED. The remaining parties are ordered to provide supplemental briefing within 45 days of this Order, specifically regarding (1) whether the Court should dismiss Count III under the *Colorado River* doctrine; (2) the preclusive effect, if any, of the Newport Superior Court's decision; and (3) whether summary judgment is otherwise appropriate with respect to Count III.

IT IS SO ORDERED.

_____
Mary S. McElroy
United States District Judge


March 27, 2026